Filed 1/25/24  P. v. Saephan CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TYLER SENG SAEPHAN,<br><br>    Defendant and Appellant. | F084169<br><br>(Super. Ct. No. 17CR-05757A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

During a purported drug deal, Tyler Seng Saephan (appellant) shot and killed Adrian Ayala in front of his home and robbed him of a large quantity of marijuana. A jury convicted appellant of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1),[1] second degree robbery (§§ 211, 212.5, subd. (c); count 2), grand theft of a firearm (§ 487, subd. (d)(2); count 3), unlawful firearm possession (§ 29820, subd. (b); count 4), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 5). As to counts 1 and 2, the jury found true the enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).) The trial court sentenced appellant to 50 years to life plus two years in state prison.

On appeal, appellant contends the trial court should have instructed the jury on heat of passion voluntary manslaughter as a lesser included offense to murder (count 1), and theft as a lesser included offense to robbery (count 2). He also claims the trial court abused its discretion at sentencing by failing to apply the lower term presumption pursuant to section 1170, subdivision (b)(6)(B), and was unaware of its discretion under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) to impose a lesser firearm enhancement. We conclude no error occurred. We affirm.

## BACKGROUND

### I.    Appellant is Found in Possession of Stolen Firearms (counts 3, 4, and 5).

In July 2015, a homeowner allowed his adult daughter to stay at his house in Merced while he went out of town on vacation. The daughter had several friends over, including appellant, and a man named Cesar Barrera. When the homeowner returned home, he discovered that his gun safe had been pried open. Numerous items were

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

missing, including a shotgun, several rifles, a nine-millimeter handgun, and several magazines. The homeowner immediately reported the theft of his weapons to the police.

Later that month, officers pulled over a tan 2001 Honda Accord. Appellant was driving and Barrera was in the front passenger's seat. The officers searched the trunk and found some of the homeowner's stolen property, including two rifles and a shotgun. They also found two magazines loaded with nine-millimeter cartridges.

The officers placed appellant and Barrera under arrest and impounded the Honda. Appellant was subsequently released from custody and retrieved the Honda from the impound yard on August 6, 2015.

The trial court admitted juvenile court records showing appellant suffered a prior juvenile adjudication that prohibited him from possessing a firearm or ammunition. (See §§ 29820, subds. (a)(1)(A), (b), 30305, subd. (a)(1).)

## II.    Ayala is Shot and Killed in Front of his House.

Ayala lived with his mother at their house in Merced. During the early morning hours of August 7, 2015, Ayala's mother walked out to the street to retrieve a tablet from her car. As she walked back into the house through the garage, she passed by Ayala, who was walking out to the street. He was carrying a yellow plastic grocery bag, and said, "I'm just going to go deliver this." Ayala's mother knew her son sold marijuana. She could not see what was inside of the bag, but understood his statement to mean he was on his way to sell marijuana.

Ayala's mother continued through the garage and into the house. While she was closing the door to the garage, she heard several gunshots that sounded very close. She went outside and found Ayala lying face down in the street. She saw a car at the end of the street driving away at a high rate of speed. She called 911. She was unable to provide any details about the car. However, a neighbor testified he looked outside of his window after hearing gunshots and saw an early 2000's Honda or Toyota sedan that was

3.

gold or silver in color. The sedan was speeding away in the same direction described by Ayala's mother.

## III. Crime Scene Evidence.

By the time police arrived on scene, Ayala was unresponsive and not breathing. His body was in the street behind his Jeep, which was parked in the driveway. The Jeep's engine was running, and a door was open. Ayala's cell phone was on the front passenger's seat connected to a charging cable. The yellow plastic grocery bag and marijuana were not located.

Ayala had been shot in the center of the chest, lower back, back of the thigh, and wrist. The gunshot wound to his chest had gunpowder stippling around the wound, indicating the shot was fired from close range. Law enforcement personnel found three expended nine-millimeter cartridge casings in the street near his body.

## IV. Cell Phone Evidence Connects Appellant to the Murder.

An officer performed a forensic extraction of the data on Ayala's cell phone. The extracted data revealed that appellant and Ayala had been communicating on Facebook Messenger. On the evening of August 6, 2015, hours before Ayala was killed, appellant expressed interest in purchasing one or more pounds of marijuana. They discussed prices and other terms of a possible deal, and appellant suggested they meet near a fast food restaurant in Merced. Around 10:00 p.m., they talked about switching to Snapchat, which automatically deletes messages, and their communication on Facebook Messenger ended.

Another officer obtained appellant's cell phone records via search warrant. The records included location data showing which cell tower appellant's cell phone was connecting to at a given time. The records showed that around the time Ayala was killed, appellant's cell phone was connecting to two cell towers in Merced. Ayala's residence was located in between the two towers.

4.

**V.      During a Law Enforcement Interview, Appellant Admits to Shooting Ayala.**

Appellant was arrested and interviewed at the police department. The interview was audio and video recorded. Portions of the recording were admitted into evidence and played for the jury.

Officers began by questioning appellant about the theft of the firearms from the homeowner's residence. He initially denied involvement, claiming he did not know about the guns in the trunk of his car, and that it was most likely Barrera who stole the guns. However, he eventually admitted he helped Barrera take the guns from the homeowner's residence.

The officers then began questioning appellant about Ayala's death. Appellant stated he knew Ayala from high school, and that they had bought and sold marijuana to each other in the past. When asked if he met with Ayala on the night he was killed, appellant claimed he tried to contact Ayala to purchase some marijuana but did not hear back from him.

After being confronted with his Facebook messages and cell phone records, appellant admitted he did meet with Ayala that night. He claimed he went to Ayala's house with Barrera. Ayala gave him a pound of marijuana as a "sample pack" that he could pay for later. The marijuana was in a large plastic "regular store bag." Appellant left and drove around for an hour with Barrera, then Ayala began messaging him demanding payment or return of the marijuana. Appellant did not want to give back the marijuana, so he considered telling Ayala they had been robbed and no longer had it. When they returned to Ayala's house, Ayala was angry, particularly at Barrera. According to appellant, Barrera thought Ayala had a gun, so Barrera shot him.

Following a break in the interview, appellant told the officers he had left out details and wanted to tell the truth. He characterized his interaction with Ayala as "a drug deal gone bad." He stated he went to Ayala's house without Barrera, and that Ayala "fronted" him a pound of marijuana. He returned to Ayala's house to obtain another

5.

pound, but Ayala demanded return of the initial pound. Ayala became upset and began reaching towards his waist. Appellant thought Ayala was going to pull out a gun, so he shot him with the pistol he had stolen from the homeowner's gun safe.

Later in the interview, appellant stated that Ayala initially gave him two pounds of marijuana, and that he was supposed to return later with either the marijuana or money to pay for it. When the officers asked appellant if Ayala had a bag of marijuana when he shot him, appellant stated he did not.

Appellant then stated his memory was "coming back" to him, and clarified that Ayala initially gave him only one pound of marijuana, and that he returned later to get a second pound. Ayala brought the second pound in a plastic grocery store bag. Ayala handed him the second pound, then asked for the money for the first pound. Appellant did not intend to pay for the marijuana and lied to Ayala that he would have to bring the second pound to a buyer before he could get money for both. Ayala became upset, and appellant thought Ayala was going to draw a gun, so appellant shot at him without looking and drove away.

Appellant stated that after the shooting, he sold the gun and the two pounds of marijuana in Sacramento.

## DISCUSSION

### I. The Trial Court's Failure to Sua Sponte Instruct the Jury on Heat of Passion Voluntary Manslaughter was Harmless Because the Jury Convicted Appellant of First Degree Felony Murder.

Appellant claims the trial court erred in failing to instruct the jury on heat of passion voluntary manslaughter as a lesser included offense to murder. Although the trial court instructed the jury on imperfect self-defense, appellant contends the court had a sua sponte obligation to instruct on heat of passion because there was substantial evidence his judgment was obscured by "fear and panic" induced by his belief Ayala was going to shoot him.

6.

We need not determine whether the trial court was obligated to instruct on heat of passion because any presumed error was harmless. The jury found appellant guilty of first degree felony murder, which does not require a finding that the perpetrator acted with malice aforethought. (§ 189, subds. (a) & (e); *People v. Balderas* (1985) 41 Cal.3d 144, 197 (*Balderas*).) Heat of passion does not apply to first degree felony murder because it negates malice. (*People v. Rios* (2000) 23 Cal.4th 450, 465.) Thus, any presumed error was harmless because a heat of passion instruction could not have affected the verdict.

## A.     Background

The trial court instructed the jury on murder with malice aforethought. (CALCRIM No. 520.) The instruction concluded with the following language: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 540A [Felony Murder:  First Degree]."

Next, the trial court gave CALCRIM No. 540A (Felony Murder: First Degree – Defendant Allegedly Committed Fatal Act (Pen. Code, § 189)), based on the evidence appellant caused the death of Ayala while committing robbery. The instruction set forth the elements of first degree felony murder as follows:

"1.  The defendant committed Robbery;

"2.  The defendant intended to commit Robbery;

"AND

"While committing Robbery, the defendant caused the death of another person."

The court did not instruct on any other theories of murder.

The trial court also instructed on self-defense (CALCRIM No. 505) and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571). The court did not

7.

give an instruction on heat of passion voluntary manslaughter. There is no indication in the record appellant requested such an instruction.

The jury convicted appellant in count 1 of first degree felony murder. The verdict form specifies the jury found appellant unlawfully killed Ayala "with malice aforethought and while engaged in the commission of the crime of robbery."

**B.    Standard of review**

In general, failure to instruct on a lesser included offense is an error of state law, and error is harmless "unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

However, in *People v. Schuller*, the Supreme Court held that the failure to instruct on voluntary manslaughter, where supported by substantial evidence, is subject to the more stringent standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Schuller* (2023) 15 Cal.5th 237, 260 & fn. 7 (*Schuller*).) This is because heat of passion and imperfect self-defense operate to negate the malice element of murder, and thus, the prosecution must disprove those circumstances beyond a reasonable doubt. (*Schuller*, *supra*, 15 Cal.5th at pp. 253–254.) Accordingly, the failure to instruct on either theory "amounts to an incomplete instruction on the malice element of murder and is therefore subject to *Chapman* review for constitutional error." (*Id.* at p. 254.)

In light of *Schuller*, we apply the *Chapman* standard to appellant's claim. Under *Chapman*, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, *supra*, 386 U.S. at p. 24.)

8.

**C.      Any presumed error was harmless because heat of passion does not apply to first degree felony murder.**

Even assuming there was substantial evidence of heat of passion, any presumed error was harmless as a matter of law, because heat of passion is inapplicable to first degree felony murder.  (*Balderas*, *supra*, 41 Cal.3d at p. 197.)

Heat of passion "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation."  (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)  Heat of passion reduces murder to manslaughter by negating the malice element of murder.  (*People v. Rios*, *supra*, 23 Cal.4th at p. 467; *People v. Bryant* (2013) 56 Cal.4th 959, 968.)  In other words, "[h]eat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter."  (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.)

However, "malice is not an element of felony murder."  (*People v. Dillon* (1983) 34 Cal.3d 441, 475.)  Rather, "the mental state required is simply the specific intent to commit the underlying felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed."  (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140–1141.)  Thus, in the case of first degree felony murder, "the defendant's state of mind with respect to the homicide … is entirely irrelevant and need not be proved at all."  (*People v. Dillon*, *supra*, 34 Cal.3d at p. 477.)  Indeed, first degree felony murder liability may extend to killings committed in the perpetration of the underlying felony that were unintentional, accidental, or negligent.[2]  (*Ibid.; People v. Farley* (2009) 46 Cal.4th 1053, 1121; see CALCRIM No. 540A.)

---

[2]      We recognize that section 189, as amended by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 3), limits felony murder liability for participants in the underlying felony who were not the actual killer.  (See § 189, subd. (e)(2) & (3).)  We need not consider these limitations because it is undisputed that appellant was the actual killer.

In the instant case, the jury convicted appellant of first degree felony murder, finding appellant caused the death of Ayala during a robbery. In reaching this verdict, the jury was not required to consider whether appellant acted with malice aforethought. Heat of passion reduces murder to voluntary manslaughter by negating the element of malice, but there was no finding of malice by the jury to negate. Therefore, an instruction on heat of passion voluntary manslaughter would have been legally irrelevant to the outcome of the trial.

*Balderas* is instructive. There, the appellant contended he was entitled to a sua sponte instruction on heat of passion voluntary manslaughter based on evidence he shot the victim when provoked by the victim's attack during a robbery. (*Balderas*, *supra*, 41 Cal.3d at p. 196.) The Supreme Court rejected the argument, reasoning: "Of course, neither 'heat of passion' nor provocation can ever reduce a *murder properly based on the felony-murder doctrine* to voluntary manslaughter …. This is so because 'malice,' the mental state which otherwise distinguishes murder from voluntary manslaughter, is not an element of felony murder. The only mental state required for felony murder is that necessary for commission of the underlying felony."[3] (*Balderas*, *supra*, 41 Cal.3d at p. 197.)

Similarly, in *People v. Demetrulias*, the appellant was convicted of first degree murder with robbery-murder special circumstances. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 5, 25.) The appellant admitted to killing the victim, but claimed he did so during a struggle that the victim initiated when the appellant came to his room to collect money from him. (*Id.* at p. 5.)

---

[3]     The Supreme Court also noted that recognizing a theory of " 'heat of passion manslaughter' " based on the resistance of the victim would produce absurd results: "[A]n accidental killing in the course of a felony would be murder, while an intentional homicide in 'panic or rage' at the victim's resistance would constitute a lesser offense. Such cannot be the law." (*Balderas*, *supra*, 41 Cal.3d at p. 197.)

The trial court denied the appellant's request to instruct on heat of passion voluntary manslaughter, reasoning the appellant's testimony did not show any provocation other than the victim's asserted attack on the appellant. (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 24.) The Supreme Court concluded any error in failing to give the instruction was harmless under *Chapman*, because the jury necessarily found the appellant committed first degree felony murder based on the instructions given. (*People v. Demetrulias*, *supra*, 39 Cal.4th at pp. 24–25.)

Here, as in *Balderas* and *Demetrulias*, an instruction on heat of passion voluntary manslaughter would have been legally irrelevant to the outcome of the trial. The jury convicted appellant of first degree felony murder, which does not require malice. A heat of passion instruction could not have produced a different result. Thus, the guilty verdict rendered in this trial was surely unattributable to the purported error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) We therefore conclude beyond a reasonable doubt that the trial court's failure to instruct on heat of passion did not contribute to the verdict, and this claim lacks merit.

## II. The Trial Court did not Err in Failing to Instruct the Jury on Theft as a Lesser Included Offense to Robbery. Any Presumed Error was Harmless.

Appellant claims the trial court should have instructed the jury on theft as a lesser included offense to robbery. He argues that based on the statements he made in his interview, there was substantial evidence that he did not take marijuana from Ayala's immediate presence, and that the shooting was not committed in furtherance of the taking. We disagree. We conclude that no reasonable juror could find appellant committed a theft but not a robbery. Therefore, no error occurred, and any presumed error was harmless.

### A. Background

Appellant was charged in count 2 with second degree robbery, and the jury was instructed with CALCRIM No. 1600 (Robbery). The trial court did not instruct the jury

11.

with any lesser included offenses as to the robbery count, and nothing in the record demonstrates appellant requested the court instruct on any such lesser included offense.

## B.     Standard of review

"A trial court must instruct on all lesser included offenses supported by substantial evidence.  [Citations.]  The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense."  (*People v. Duff* (2014) 58 Cal.4th 527, 561.)  "Substantial evidence in this context is that which a reasonable jury could find persuasive."  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414; see *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)  In other words, there must be " 'evidence from which a rational trier of fact could find beyond a reasonable doubt' " that the defendant committed only the lesser offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

We review claims involving the failure to instruct on a lesser included offense de novo, considering the evidence in the light most favorable to the accused.  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

It is undisputed that theft is a lesser included offense of robbery.  (See *People v. Webster* (1991) 54 Cal.3d 411, 443.)

## C.     The trial court had no sua sponte duty to instruct on theft because there was not substantial evidence appellant committed a theft but not a robbery.

Appellant acknowledges that he gave "inconsistent accounts of the shooting" during his law enforcement interview.  He ultimately told the officers that when he returned to Ayala's house a second time, Ayala handed him a second bag of marijuana before he shot him.  Nonetheless, appellant argues a reasonable jury could have instead believed one of his initial accounts of the shooting—specifically, that when he returned to Ayala's house, Ayala did not give him additional marijuana.  Based on these initial accounts, he contends the jury could have found that the shooting occurred because of a

12.

dispute over his already completed theft of Ayala's marijuana. Therefore, according to appellant, no robbery occurred because the marijuana was not taken from Ayala's "immediate presence." (§ 211; see *People v. Webster*, *supra*, 54 Cal.3d at p. 440.)

We disagree. During the interview, appellant's version of events evolved as he was questioned by detectives and confronted with the evidence against him. As his story changed, he either admitted he had been untruthful, or claimed that he had taken drugs to try to block out his memory of the shooting, which was slowly coming back to him. In the process, he acknowledged that his prior descriptions of the shooting were inaccurate. Thus, even appellant rejected his own prior accounts as false. Given this, we reject appellant's assertion that a reasonable jury could find these initial accounts persuasive and conclude that only a theft occurred.

We also observe that all the other evidence at trial amply supported the conclusion that appellant committed a robbery rather than a theft. Ayala's mother testified that moments before the shooting, she saw Ayala walking out of their house to the street carrying a plastic grocery bag. Circumstantial evidence, including Ayala's statement that he was going to "deliver this," strongly supported the inference the bag contained marijuana. Just after Ayala's mother stepped inside the house, she heard gunshots and saw a car speeding away. Ayala was shot in the center of his chest, and his wound had stippling, indicating he was shot at close range. Following the shooting, the plastic grocery bag of marijuana was never located.[4] Given that Ayala was shot in the chest from close range moments after he walked out to the street with the bag of marijuana, the perpetrator fled immediately after the shooting, and the bag of marijuana was no longer at

---

[4]     Appellant argues that the evidence did not establish that the plastic grocery bag of marijuana was missing because no law enforcement witness testified that he or she searched the entirety of Ayala's car. This is not supported by the record. A "Crime Scene Response Team" processed the scene for evidence, and multiple witnesses, including Ayala's mother, testified they did not see a plastic grocery bag in the area.

13.

the scene, the independent evidence conclusively established Ayala was murdered during the course of a robbery.

Appellant also claims that even if the jury accepted his final account of the shooting in the interview—that Ayala gave him a pound of marijuana the second time he went to his house—the jury could still have concluded no robbery occurred because he did not shoot Ayala in furtherance of the taking. (See, e.g., *People v. Estes* (1983) 147 Cal.App.3d 23, 28; *People v. Bradford* (1997) 14 Cal.4th 1005, 1055–1056.) He contends the jury could have found that he shot Ayala only out of fear or panic, not to retain the second pound of marijuana that Ayala had just handed to him.

This contention is not supported by the record. Appellant told the officers he intended to steal the marijuana from Ayala. When Ayala became upset, appellant made no effort to return the marijuana he did not pay for. Instead, he shot Ayala multiple times, including once in the chest from close range, and left with the marijuana. Appellant's statement that he thought Ayala was reaching for a gun does not assist him. (See *People v. Costa* (1963) 218 Cal.App.2d 310, 316 [self-defense is not a recognized defense to robbery].) Rather, it demonstrates that appellant completed the robbery by using force to take the marijuana "or to prevent [Ayala] from resisting." (*People v. Scott* (2009) 45 Cal.4th 743, 749.)

Based on this record, appellant has not demonstrated there was substantial evidence that he committed a theft but not a robbery. Therefore, our de novo review reveals the trial court did not err in failing to instruct the jury with the lesser included offense of theft as to count 2.

### D. Any presumed error was harmless.

Even assuming the trial court committed instructional error, any presumed error was harmless. Appellant agrees the failure to instruct on a lesser included offense in a noncapital case is an error of state law and appellate review for prejudice occurs under

14.

the standard set forth in *Watson*. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 178.) Under this standard, we review the entire record to determine if it is reasonably probable a more favorable outcome would have occurred. (*Ibid.*) "Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Id*. at p. 177.)

As we explained above, the evidence that appellant committed a robbery was overwhelming, and there was no reasonable basis to conclude that only a theft occurred. Accordingly, appellant fails to demonstrate a reasonable probability of a different outcome had the trial court given the requested instruction. Any presumed error was harmless.

**III.    The Trial Court was not Required to Apply the Section 1170, Subdivision (b)(6)(B) Lower Term Presumption at Sentencing Because Nothing in the Record Suggested Appellant's Youth was a "Contributing Factor" in the Commission of the Offenses.**

The trial court sentenced appellant to the middle term on counts 2 and 3. Appellant contends that because he was 20 years old at the time of the offense, the trial court abused its discretion in failing to treat the lower term as the presumptive sentence in accordance with section 1170, subdivision (b)(6)(B). We conclude appellant was properly sentenced, because nothing in the record shows appellant's youth was a "contributing factor" in the commission of the underlying offenses. (§ 1170, subd. (b)(6).)

**A.    Assembly Bill No. 124 and section 1170, subdivision (b)(6)(B).**

Effective January 1, 2022, Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5) amended section 1170 by adding paragraph 6 to subdivision (b), which provides, in pertinent part: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:

[¶] … [¶] (B) The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." Section 1016.7 defines "youth" as "any person under 26 years of age on the date the offense was committed."

### B.    Background

At sentencing, the trial court sentenced appellant on count 2, second degree robbery, to the middle term of three years, plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), but stayed the sentence pursuant to section 654, subdivision (a). On count 3, grand theft of a firearm, the trial court sentenced appellant to the middle term of two years.[5]

Defense counsel declined to make any comments at sentencing and did not submit a sentencing memorandum or other materials. Neither the trial court nor counsel for either party made any reference to appellant's age or the applicability of section 1170, subdivision (b)(6)(B).

The trial court noted it had read and considered the probation report. In the "Evaluation" section of the report, the probation officer noted: "The [appellant] is young and when the present offense occurred, he was twenty (20) years old. He had no prior adult convictions, but had a lengthy juvenile record that contained violent offenses."

The probation report listed eight factors in aggravation, including: "The crime involved great violence, great bodily harm … or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1)); "The manner in which the crime was carried out indicates planning, sophistication, or professionalism" (Cal. Rules of Court, rule 4.421(a)(8)); and, "The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness" (Cal. Rules of Court, rule 4.421(b)(2)). As to

---

[5]    The trial court stayed sentence on counts 4 and 5 pursuant to section 654, subdivision (a), but did not specify the term imposed.

16.

factors in mitigation, the report only listed the following: "The victim was an initiator of, willing participant in, or aggressor or provoker of the incident."

## C. Standard of review

Sentencing decisions are subject to the abuse of discretion standard. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Hicks* (2017) 17 Cal.App.5th 496, 512.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Thus, "[a]n abuse of discretion occurs when the trial court ... is unaware of its discretion." (*In re White* (2020) 9 Cal.5th 455, 470.) However, "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1390; see *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The court is presumed to have considered all of the relevant factors."].) The burden is on the party attacking the sentence to demonstrate an abuse of discretion occurred. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) "To meet this burden, the [appellant] must 'affirmatively demonstrate that the trial court misunderstood its sentencing discretion.' " (*People v. Lee* (2017) 16 Cal.App.5th 861, 866.)

## D. The lower term presumption was inapplicable because nothing in the record suggested appellant's youth was a "contributing factor" in the commission of the offenses.

In *People v. Fredrickson*, the court held an appellant who was under the age of 26 was not entitled to the section 1170, subdivision (b)(6)(B) lower term presumption, because nothing in the record showed the appellant's youth was a " 'contributing factor' " in the commission of the underlying offense. (*People v. Fredrickson* (2023) 90

17.

Cal.App.5th 984, 987 (*Fredrickson*).) *Fredrickson* observed that section 1170, subdivision (b)(6)(B) "does not mandate a presumption in favor of the lower term in every case in which the defendant was under age 26 at the time the crime was committed. Instead, the presumption applies only if the defendant's youth was 'a contributing factor' in his or her commission of the offense." (*Fredrickson*, *supra*, 90 Cal.App.5th at p. 991.) "[I]n order to trigger the presumption, there must be some initial showing that the defendant's youth was a contributing factor, and only then must the record affirmatively show compliance with the statute." (*Id.* at p. 992.)

Fredrickson declined to decide the "precise nature of the showing required" because the appellant conceded there was nothing in the record showing the appellant's youth contributed to the commission of the offense. (*Fredrickson*, *supra*, 90 Cal.App.5th at p. 994.) The court also reviewed the record, including the probation reports, sentencing memorandum, and arguments at the sentencing hearing, and found no indication the appellant's youth was a contributing factor. (*Ibid.*) It noted, however, that the initial showing does not need to be made by the defendant, but instead can be made by the prosecution or the probation report. (*Id.* at p. 994, fn. 8.)

Appellant contends that here, unlike in *Fredrickson*, the probation report provided the initial showing that his youth was a contributing factor to the commission of his offenses. He points to the probation officer's statements that "[t]he [appellant] is young and when the present offense occurred, he was twenty (20) years old." We are not persuaded. The probation officer's statement only conveyed that appellant was under the age of 26 at the time of his offenses. It did not suggest appellant's youth was a contributing factor in their commission.

Appellant also relies on the probation officer's statement that while appellant had no adult criminal history, he had an extensive juvenile record involving violent offenses. He contends the purpose of this observation was to "undercut the mitigating circumstance of youth," impliedly recognizing that his youth could have been a contributing factor.

18.

We do not read the probation report this way. The probation officer's statement merely highlighted that appellant had a lengthy and violent criminal history even though he had no adult criminal record. Nothing about this observation suggests appellant's youth was a contributing factor to his offenses.

Appellant also claims the trial court was unaware of its sentencing obligations under section 1170, subdivision (b)(6)(B), based on the following statement it made at the outset of the sentencing hearing: "I would note that with the new sentencing laws, we did not have any findings as to factors in aggravation and mitigation." He suggests this shows the trial court erroneously believed that factors in mitigation would have to be found true by the jury for it to impose the lower term, and thus, the record is ambiguous as to whether the trial court properly understood its discretion under section 1170, subdivision (b)(6)(B).

Appellant's interpretation of the record is inaccurate. The trial court's comment was clearly a reference to Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3), which became effective the same day as Assembly Bill No. 124. Senate Bill No. 567 amended section 1170 such that a sentencing court may only impose the upper term where factors in aggravation have been found true beyond a reasonable doubt by the jury or the court or stipulated to by the defendant. (§ 1170, subd. (b)(1) & (2).) Nothing in the record leads us to conclude the trial court was referring to its ability to impose the lower term.

Here, as in *Fredrickson*, the record contains no initial showing that appellant's youth was "a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6).) Therefore, the trial court did not abuse its discretion in failing to apply the section 1170, subdivision (b)(6)(B) lower term presumption, and this claim lacks merit.

### E. Appellant fails to demonstrate ineffective assistance of counsel.

Appellant raises the alternative argument that his defense counsel was ineffective for failing to argue for the application of the section 1170, subdivision (b)(6)(B) lower term presumption.

To prevail on an ineffective assistance of counsel claim, the claimant must establish counsel's performance fell below an objective standard of reasonableness, and that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) On direct appeal, an ineffective assistance of counsel claim will be sustained "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

In *Fredrickson*, the appellant raised an ineffective assistance of counsel claim on the same basis. (*Fredrickson*, *supra*, 90 Cal.App.5th at p. 994.) The court rejected the claim, reasoning there was nothing in the record on *direct appeal* establishing defense counsel's performance was deficient, because there was no indication in the record the appellant's youth was a contributing factor in the commission of the underlying offense. (*Id.* at p. 995.) *Fredrickson* therefore reasoned, "we cannot conclude counsel was deficient in failing to present information that may or may not exist." (*Ibid.*)

Here, similarly, there is nothing in the record to suggest appellant's youth was a contributing factor. Thus, on this record there is no basis to conclude defense counsel was ineffective for failing to raise the lower term presumption, or that it is reasonably probable appellant would have received a more favorable outcome. Accordingly, appellant fails to establish ineffective assistance of counsel.

### IV. The Record does not Demonstrate the Trial Court was Unaware of its Discretion to Impose a Lesser Firearm Enhancement Under *Tirado*.

Two months before appellant was sentenced, the Supreme Court decided *Tirado*, holding that a trial court may strike a section 12022.53, subdivision (d), firearm enhancement and impose a lesser uncharged statutory enhancement. (*Tirado*, *supra*,

12 Cal.5th at p. 692.)  Appellant contends the trial court only understood its discretion to strike the enhancement outright but was not aware of its discretion to impose a lesser included enhancement under *Tirado*.  We conclude the record demonstrates the trial court was aware of its discretion, and appellant was properly sentenced.

### A.    Background

At the beginning of the sentencing hearing, the trial court noted it "has the discretion under recent case law changes for the firearms enhancement."  Later, while sentencing appellant on the section 12022.53, subdivision (d), firearm enhancement as to count 1, the trial court stated, "And the Court acknowledges that it has discretion to stay that punishment.  However, the Court declines to stay the punishment as this crime resulted in the loss of life of a very young man and, therefore, the Court feels that a 15 to life sentence is appropriate."[6]  The court then sentenced appellant on count 1 to 25 years to life for first degree murder, and 25 years to life on the section 12022.53, subdivision (d), firearm enhancement.

Defense counsel did not request the trial court strike the section 12022.53, subdivision (d) enhancement, or impose a lesser included enhancement.

### B.    Senate Bill No. 620 and *Tirado*.

Effective January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2) amended section 12022.53, subdivision (h) to give trial courts discretion to "strike or dismiss" enhancements imposed under this section "in the interest of justice pursuant to Section 1385."

In January 2022, the Supreme Court decided *Tirado*, holding that section 12022.53, as amended by Senate Bill No. 620, "permits a court to strike [a] section

---

[6]    Based on the context of this statement, it appears the trial court misspoke when it referred to a "15 to life" sentence, as the section 12022.53, subdivision (d) enhancement requires "an additional and consecutive term of imprisonment in the state prison for 25 years to life."

21.

12022.53[, subdivision] (d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead." (*Tirado*, *supra*, 12 Cal.5th at p. 692.) Thus, under *Tirado*, a trial court may either strike a section 12022.53, subdivision (d) enhancement outright, or impose a lesser uncharged enhancement under section 12022.53, subdivision (c) or section 12022.53, subdivision (b).[7]

**C.     Appellant fails to show the trial court was unaware of the scope of its sentencing discretion.**

Appellant contends the record suggests the trial court was unaware of its discretion under *Tirado* because it only stated on the record it was declining to strike the section 12022.53, subdivision (d), firearm enhancement outright. According to appellant, the trial court's failure to expressly state that it had discretion under *Tirado* to impose a lesser enhancement shows it was unaware of that discretion.

Appellant's argument is premised on an incorrect standard of review. As we explained above, the burden is on appellant to " 'affirmatively demonstrate that the trial court misunderstood its sentencing discretion.' " (*People v. Lee*, *supra*, 16 Cal.App.5th at p. 866.) Moreover, "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1390.) Here, nothing in the record suggests the trial court was unaware of its discretion under *Tirado*. The trial court's statement that it was declining to strike the firearm enhancement outright does not affirmatively demonstrate it was unaware of its discretion to impose a lesser enhancement.

We are also persuaded by the trial court's statement it was aware of its "discretion under recent case law changes for the firearms enhancement." Considering the context in

---

[7]     Whether the trial court may also impose a lesser uncharged enhancement under section 12022.5 is currently pending before the California Supreme Court. (See *People v. McDavid* (July 14, 2022, D078919) [nonpub. opn.], review granted Sept. 28, 2022, S275940.)

which this statement was made, it is apparent the trial court was referring to *Tirado,* which was decided only months before the sentencing hearing. We have no reason to believe the trial court was only referring to Senate Bill No. 620, which had been in effect for over four years at the time of sentencing, and was a statutory amendment, rather than new caselaw. Thus, the record affirmatively demonstrates the trial court *was aware* of its discretion under *Tirado*, and the trial court did not abuse its discretion in sentencing appellant.

## **DISPOSITION**

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.

23.